IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| The Medical Protective Company of Fort Wayne, Indiana, | ) ) ) | C.A. No. 3:08-2184-CMC |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | OPINION AND ORDER |
| South Carolina Medical Malpractice Liability Insurance Joint Underwriting Association, | ) ) ) | ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| | ) ) | |
| Defendant. | ) | |
| _____ | ) | |
| South Carolina Medical Malpractice Liability Insurance Joint Underwriting Association, | ) ) ) | C.A. No. 3:08-2222-CMC |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| The Medical Protective Company of Fort Wayne, Indiana, | ) ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Through these consolidated actions, two providers of medical malpractice insurance seek a declaration as to their respective obligations for the alleged malpractice of their mutual insureds, John H. Hibbitts, M.D. ("Dr. Hibbits") and Palmetto Bone and Joint, P.A. ("PBJ"). The underlying malpractice action related to a course of treatment provided to Sara A. Shealy ("Shealy") from December 19, 2002, through March 10, 2004.

The two insurers, South Carolina Medical Malpractice Liability Joint Underwriting Association ("JUA") and The Medical Protective Company of Fort Wayne, Indiana ("MedPro"), each provided professional liability coverage for some portion of that period. JUA's policies, as

more fully described below, collectively provided coverage for "occurrences" during the period August 14, 2002, to October 1, 2003. MedPro's policies provided coverage on a claims-made basis for a period that included the date on which the malpractice claim was made. MedPro's policies also included a retroactive limitation which precluded coverage of medical treatment provided (or which should have been provided) prior to October 1, 2003.

The underlying malpractice action was settled for $475,000 on May 13, 2008. MedPro and JUA each contributed $200,000 to the settlement, reserving their rights to seek indemnification through the present actions. The parties also agreed that the remaining $75,000 would be paid at the conclusion of these actions in accordance with this court's ruling as to relative liability.

The matters are now before the court on JUA and MedPro's cross motions for summary judgment. For the reasons set forth below, the court concludes that MedPro is responsible for $67,980.50 of the $475,000 settlement and JUA is responsible for the remainder.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the

moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## FACTS

The facts necessary to resolution of the cross motions for summary judgment are not in dispute. *See* Dkt. No. 36, Stipulation of Facts ("Stipulation"); Dkt. No. 35-9 (Deposition of Frank R. Voss, M.D. ("Voss Dep.")).[1] These facts are as set out below:

**Malpractice Claim.** The underlying malpractice claim arose out of Dr. Hibbits' post-surgical treatment of Shealy. The surgery, replacement of a hip joint, was performed on December 19, 2002. Approximately two weeks after surgery, Dr. Hibbits discovered that the hip joint was infected. He and other employees of PBJ began treating the infection by placing Shealy on a course of antibiotics and wound treatment procedures. Dr. Hibbits continued to treat the infection in the same general manner for well over a year, seeing Shealy for office visits periodically including several times after October 1, 2003.

In March 2004, Dr. Hibbits referred Shealy to Frank R. Voss, M.D. ("Dr. Voss") for treatment of the chronic infection. Dr. Voss's treatment included removal of the hip joint as well as ten inches of Shealy's fibula. In the underlying malpractice action, Dr. Voss opined that Dr. Hibbits violated the standard of care by failing to modify his course of treatment and remove the artificial hip no later than May 2003. According to Dr. Voss, Dr. Hibbits continued course of

---

[1] Excerpts from Dr. Voss's deposition were filed in support of MedPro's motion rather than as part of the Stipulation. *See* Dkt. No. 35-9 (Voss Dep.). No other evidence has, however, been provided relating to the issues addressed by Dr. Voss. His testimony is, therefore, uncontradicted.

treatment, which consisted only of "wound care almost forever," exacerbated the injury. Dr. Voss opined that 80 to 85% of the damage was done prior to September 2003. Voss Dep. at 25. He also opined that Shealy's condition worsened from October 2003 until March 2004. *Id.* at 28-29. Dr. Hibbitts's medical records reveal that he continued to see Shealy and to provide treatments during that period. Stipulation Ex. I (Dkt. No 36-10 at 65-70) (reflecting at least five office visits).

The Shealy claim was first reported to MedPro on February 6, 2006. The claim was ultimately settled for $475,000 on May 13, 2008. MedPro and JUA each contributed $200,000 at the time of the settlement. The remainder is to be paid once their respective liability is resolved through these actions.

**JUA Policies.** JUA issued and delivered two sets of professional liability policies relevant to the claims in this action. Both sets (one each to Dr. Hibbits and PBJ for each of the relevant periods) were "occurrence" policies, covering "sums which the Insured shall become legally obligated to pay as damages because of any claim or claims made against the Insured arising out of the performance of professional services rendered or which should have been rendered, during the policy period." *E.g.*, Stipulation, Ex. B (Dkt. No. 36-3 at 4). Each policy contained limits of $200,000 per claim. The first set covered a policy period of August 14, 2002, to August 14, 2003. Stipulation ¶¶ 4-5, Ex. B. The second set covered a policy period of August 14, 2003, to October 1, 2003. Stipulation ¶¶ 6-7, Exs. C and D.[2]

---

[2] Coverage ended "effective October 1, 2003," as a result of Dr. Hibbitts' cancellation of the second set of JUA policies, which, otherwise, would have continued for a full year. *See* Stipulation, Ex. C (Dkt. No. 36-4 at 6–letter dated November 13, 2003); Stipulation, Ex. D (Dkt. No. 36-5 at 6–same).

The JUA policies contained the following "Additional Conditions" relevant to allocation of responsibility where other insurance is also available for a covered loss:

> b)   The insurance afforded by this policy is excess insurance should the insured have other insurance applicable to a loss under this policy. On an excess, contingent, or primary basis, this policy will come into effect only after such other insurance has been exhausted.
>
> c)   When both this insurance and other insurance apply to the loss on the same basis, excess or contingent, the Association shall not be liable under this policy for a greater portion of the loss than stated in the applicable contribution provision below.
>
> CONTRIBUTIONS BY LIMIT – If any of such other insurance does not provide for the contribution by equal shares, the Association shall not be liable for a greater portion of such loss than the applicable limit of liability on this policy for such loss bears to total applicable limit of liability of all valid and collectible insurance against said loss.

*E.g.,* Stipulation, Ex. B (Dkt. No. 36-3 at 5).

**MedPro Policies.** MedPro issued Dr. Hibbits and PBJ modified "claims-made" professional liability policies for two separate terms: October 1, 2003, to October 1, 2004 (Stipulation ¶ 8, Exs. E and F); and October 1, 2005 to October 1, 2006 (Stipulation, Exs. G. and H).[3] The later policies covered the period during which the Shealy malpractice claim was asserted. Thus, it is only the later policies (one each issued to Dr. Hibbits and PBJ) which are subject to allocation.

Each of the MedPro policies provides $1,000,000 per claim (and $3,000,000 aggregate) coverage for:

> ANY CLAIM FOR DAMAGES, FILED DURING THE TERM OF THIS POLICY, BASED ON PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED AFTER THE RETROACTIVE DATE, BY THE

---

[3] The stipulation incorrectly suggests that both of the policies for the later period are found at Exhibit G and that the medical records are located at Exhibit H. Instead, the PBJ Policy for the later period is at Exhibit H and the medical records are at Exhibit I.

INSURED . . . , IN THE PRACTICE OF THE INSURED'S PROFESSION AS HEREINAFTER LIMITED AND DEFINED.

*E.g.*, Stipulation, Ex. G (Dkt. No. 36-8 at 3 ¶ A).

The "Retroactive Date" in each of MedPro's policies was set as October 1, 2003. *Id.* (Dkt. No. 36-8 at 5). This date marks the date before which Shealy suffered at least eighty percent of the damage according to Dr. Voss's testimony. Voss Dep. at 25.

The MedPro policies also included a number of exclusions following the heading: "EXCEPT THIS POLICY DOES NOT COVER[.]" The seventh item listed after this heading is "any liability for a claim made against the Insured, *based upon professional services rendered or which should have been rendered prior to the Retroactive Date Shown on this policy*[.]" *E.g.,* Stipulation, Ex. G (Dkt. No. 36-8 at 3–emphasis added). As noted above, the Retroactive Date was set as October 1, 2003.

Under a separate section (designated as "E"), the MedPro policies include the following provisions regarding when a claim constitutes a single incident and when a claim qualifies for coverage under the policies' aggregate limits:

> [T]he Company's total liability for damages including prejudgment interest shall not exceed the stated amount per claim filed for any one incidence and, subject to the same limit per claim filed for each incidence, the Company's total liability during any one policy year shall not exceed the stated annual aggregate.
>
> Furthermore, for the purpose of determining the Company's liability, the following shall be considered as arising from one incident:
>
> a)      all injury resulting from a series of acts or omissions in rendering professional services to one person[;] and
>
> b)      all injury arising out of continuous or repeated exposure to substantially the same general conditions.

Stipulation, Ex. G (Dkt No. 36-8 at 4 ¶ E).

Under the heading "Other insurance," the MedPro policies contain the following provisions relating to allocation of liability:

> The insurance afforded by this policy is primary insurance, except when the insured has other valid and collectable insurance applicable to a loss covered by this policy, in which event this insurance shall be excess over such other valid and collectible insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of other insurance.

> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater portion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

Stipulation, Ex. G (Dkt No. 36-8 at 4 & 6).[4]

## ARGUMENTS

**JUA Position.** JUA argues that respective liability as between JUA and MedPro should be assessed based solely on the parties' relative amounts of coverage. This argument rests on the combined rulings in *Joe Harden Builders, Inc. v. Aetna Casualty & Surety Co.*, 486 S.E.2d 89 (S.C. 1997) ("*Joe Harden*"), and *South Carolina Ins. Co. v. Fidelity and Guar. Ins. Underwriters, Inc.*, 489 S.E.2d 200 (S.C. 1997) ("*SCIC*").[5]

In *Joe Harden*, the South Carolina Supreme Court addressed when coverage is triggered under a standard commercial general liability ("CGL") policy for progressive damage which begins during a policy term but is not discovered until after the policy ends. Noting the occurrence-based

---

[4] The first sentence in this quotation is supplied by an addendum which replaces the first sentence as stated in the primary policy document. *See* Dkt. No. 36-8 at 6.

[5] Both *Joe Harden* and *SCIC* came before the South Carolina Supreme Court on certified questions from the District of South Carolina.

nature of the policy, the court adopted a hybrid trigger theory, combining aspects of continuous trigger and injury-in-fact theories.

> We hold coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage. Such an injury-in-fact/continuous trigger does not penalize the insured by requiring a manifestation of damage during the policy period, nor does it penalize the insurer by extending coverage from the time of the underlying event when no injury has yet occurred. We conclude this interpretation of the policy best meets the fair expectations of the parties under the language of the policy. Further, this theory of coverage will allow the allocation of risk among insurers when more than one insurance policy is in effect during the progressive damage.

*Id.*, 486 S.E.2d at 91 (declining to make factual determination regarding application of the trigger).[6]

For purposes of this order, the court assumes that the rule set down in *Joe Harden* applies with equal force to claims for personal injuries pursued under an occurrence-based professional liability policy. Such a rule was applied in *Pharmacists Mut. Ins. Co. v. Urgent Care Pharmacy, Inc.*, 413 F. Supp. 2d 633, 642-43 (D.S.C. 2006), *affirmed* 232 Fed. Appx. 217 (4th Cir. 2007) ("*Urgent Care*").[7]

Although *Joe Harden* notes that the modified continuous trigger theory will allow for allocation of liability between insurers, it does not address the basis on which such allocation should be made.[8] That issue was addressed in *SCIC*, in which the court held, *inter alia*, that where two policies which "provide coverage for the same peril to the same property and interest," have similar

---

[6] The critical "language of the policy" referenced in this quotation is the policy's definitions of "occurrence" and "property damage." An "occurrence" is defined, in relevant part, as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage . . . ." "Property damage" is defined, in relevant part, as "physical injury . . . which occurs during the policy period . . . ."

[7] *See infra* at 12-13 (discussing *Urgent Care*).

[8] Allocation was, likewise, not an issue addressed in *Urgent Care*.

excess insurance clauses, and "there is nothing else in the policies that differentiates the kind of coverage they provide, the clauses should be disregarded as mutually repugnant and the loss should be prorated between [the insurers] according to their respective policy limits." *Id.* at 201, 205 (addressing allocation of liability between policy which provided specific coverage to damaged properties and blanket policy which provided general coverage to business). In reaching this decision, the court noted, as a threshold matter, that the policies at issue covered the same risk (property damage to three buildings), the same interest (commercial property), were for the benefit of the same insured (the business owner), and applied to the same time period. *Id.* at 4.

JUA argues that the rule set down in *Joe Harden* requires the court to find JUA and MedPro each responsible for the entire "occurrence," because the occurrence began during the periods covered by JUA's policies and ended after the retroactive coverage date of the MedPro policies.[9] JUA further asserts that, under *SCIC*, liability should be allocated based on the insurer's relative amounts of coverage, disregarding any differences in the time periods covered by the policies. JUA's resulting percentage of responsibility under this theory would be somewhere between 16.7 and 28.7 percent.[10]

---

[9] JUA bolsters this argument by relying on the explanation of what constitutes a single incident found in section E of the MedPro policies. JUA argues that this language brings the MedPro coverage within the "occurrence" language discussed in *Joe Harden*. Alternatively, JUA asserts that the language found in section E creates an ambiguity which should be construed in favor of coverage.

[10] The precise percentage of this allocation is subject to some debate. JUA suggests its proper percentage of liability is one-sixth of the total settlement (roughly 16.7%) and that MedPro is responsible for the remainder. JUA bases this calculation on its per-claim limit of $200,000 relative to the total per-claim limits of all policies in effect during the relevant period. JUA presumes the latter to be $1,200,000 (JUA's $200,000 plus MedPro's $1,000,000). This calculation ignores the fact that JUA issued separate policies for two different periods during which the malpractice was ongoing, while the claim was made during only one period covered by any MedPro policy. Counting each policy period separately, JUA would be responsible for a total of $400,000

**MedPro Position.** MedPro rejects the JUA analysis on the grounds that MedPro's claims-made policies contain materially different language from the standard occurrence-policy language at issue in *Joe Harden*. MedPro, instead, argues that it has no liability for the claims because it is not responsible for damages resulting from an inappropriate course of treatment which was commenced prior to its "retroactive" date where any treatment which occurred after the retroactive date was merely a continuation of the same inappropriate course of treatment.

Alternatively, MedPro argues that its policies cover no more than 20% of the total settlement based on Dr. Voss's testimony that at least 80% of the damages occurred before October 1, 2003, the retroactive date applicable under MedPro's policies. MedPro further argues that, because JUA's policies also cover the portion of Shealy's damages attributable to this period, that portion of the settlement should be allocated between MedPro and JUA.[11] Thus, MedPro argues its maximum liability is something less than 20% of the total settlement.

MedPro relies, in particular, on the basic coverage terms of its policies which make MedPro responsible only for a "claim for damages, filed during the term of this policy, *based on professional services rendered or which should have been rendered after the retroactive date*, by the insured[.]" Stipulation Ex. G (Dkt. No. 36-8 at 3– capitalization modified, emphasis added). MedPro also relies on its policies' exclusion of coverage for: "any liability for a claim made against the Insured, *based*

---

in coverage relative to a total coverage of $1,400,000 for all relevant policies. Under this calculation, JUA would be responsible for roughly 28.7% of the settlement. Because it would not lead to any different result (as both the numerator and denominator would be doubled), the court has disregarded the additional policies issued to PBJ during the same period in making these calculations.

[11] MedPro calculates the portion attributable to this period as $95,000 (20% of $475,000). It then suggests that the allocation should be equally split between JUA and MedPro. The basis for the equal allocation is not, however, explained.

*upon professional services rendered or which should have been rendered prior to the Retroactive Date Shown on this policy[.]"* *Id.* (emphasis added).

## DISCUSSION

### 1.    JUA AND MEDPRO COVERAGE OF SHEALY CLAIMS

Before responsibility for the settlement may be allocated between JUA and MedPro, the court must first consider the extent to which JUA and MedPro might, independently, be held responsible for Shealy's claims.

**JUA Coverage.**  Under the rule set down in *Joe Harden*, the course of treatment which Dr. Hibbitts provided to Shealy and her resulting damages constituted a single "occurrence" under JUA's occurrence-based policies.  JUA is, therefore, responsible for the full amount paid (or to be paid) in settlement of Shealy's claims, subject to any applicable policy limits and JUA's right to allocation of damages among any other insurers responsible for the same occurrence.[12] *See Century Indemnity Co. v. Golden Hills Bldrs., Inc.*, 561 S.E.2d 355 (S.C. 2002) (applying *Joe Harden* to CGL policy where damage began during policy period but was not noticed until eight years later and finding that, but for an applicable exclusion, "the insurance policy provides coverage for property damage that occurred during the policy period *and* for any continuing damage"–emphasis in

---

[12] There is a third insurer which has potential liability for the Shealy settlement.  That insurer provided excess coverage to JUA but is not involved in the present actions.  JUA suggests that MedPro waived its right to dispute allocation of at least $75,000 of Shealy's settlement to JUA because MedPro failed to bring in JUA's excess insurer.  This argument is without merit for two reasons.  First, JUA's total coverage for the relevant period is $800,000 ($200,000 under each of four policies).  Second, no action by MedPro prevented JUA from bringing its excess insurer into the underlying settlement (or otherwise alerting it to the concern) if JUA thought that the excess insurance might be implicated.

original).[13]

**MedPro Coverage.** The MedPro policies are all claims-made policies, which contain distinctly different coverage and exclusion language than contained in the JUA policies or the policy addressed in *Joe Harden*. Thus, the rule laid down in *Joe Harden* is not dispositive of MedPro's liability.[14]

The district court and Fourth Circuit's extension of the rule in *Joe Harden* to the professional liability policy at issue in *Urgent Care*, is, likewise, not dispositive because that policy was also an occurrence-based policy. Nonetheless, *Urgent Care* does represent application (and, arguably, extension[15]) of the *Joe Harden* rule to: (1) professional liability policies; (2) personal injuries; and (3) injuries flowing from events predating the commencement of coverage. It remains, however, that the policy at issue in *Urgent Care* was an occurrence-based policy with language markedly similar to that at issue in *Joe Harden*, and distinctly different from MedPro's claims-made policies.[16]

---

[13] *Golden Hills* came before the South Carolina Supreme Court on multiple questions certified from the Fourth Circuit Court of Appeals. Despite finding that the basic terms of coverage applied to all damages regardless of when they occurred, the court ultimately denied coverage under the "your work" exclusion. No similar exclusion applies in the present action.

[14] For a general discussion of the distinctions between these types of policies see *Truck Ins. Exchange v. Ashland Oil, Inc.*, 951 F.2d 787 (7th Cir. 1992) (explaining distinctions between claims-made and occurrence-based policies) and *National Cycle, Inc. v. Savoy Reinsurance Co. Ltd.,* 938 F.2d 61, 62 (7th Cir. 1991) (explaining, *inter alia*, the purposes of the retroactive date limitation in claims-made policies).

[15] The rule at issue is, of course, one of state law. Thus, the decisions of the District Court and Fourth Circuit represent only a prediction of how the state court would rule. For purposes of this order, the court presumes they are a correct prediction.

[16] The specific issue before the court in *Urgent Care* was whether an occurrence-based professional liability policy covered injuries which resulted from negligent acts predating the effective date of the policy. The negligent act involved the compounding of an injectable drug by the insured. The injuries were manifested during the policy period after the drug was injected by a third-party. Some of the injections predated and some fell within the policy period. The specific

The parties have not directed the court to any other South Carolina, Fourth Circuit, or District of South Carolina case which addresses the effect of a retroactive limit in a claims-made policy in a situation such as that presented to this court. Neither has this court located any such authority. The court has, therefore, considered *sua sponte* whether to certify the question of MedPro's liability to the South Carolina Supreme Court. The undersigned concludes, however, that certification is unnecessary as there is sufficient guidance in South Carolina law to resolve the present dispute.

The court begins by considering the rationale behind the ruling in *Joe Harden*. In announcing its decision, the South Carolina Supreme Court noted that the trigger it adopted "best meets the fair expectations of the parties under the language of the policy." *Joe Harden*, 486 S.E.2d at 91. The court also repeatedly referred to "the plain language of the policy," and the court's desire to "give effect to the policy provision(s)" and be "consistent with the policy's requirement(s)." *Id.* at 90–91.

The court also distinguished an earlier case, *Spinx Oil Co. v. Federated Mut. Ins. Co.*, 427 S.E.2d 649 (S.C. 1993), on the grounds that the court in *Spinx Oil* was "concerned solely with construing

---

policy defined "occurrence" as "an act of rendering or failure to render pharmacy services *which results in bodily injury*, or property damage within the coverage territory, and *during the policy period*." *Id.* at 643 (emphasis added).

Based on *Joe Harden*, the district court concluded that the policy covered all injuries *manifested* during the policy period, regardless of whether the policy was in force when the drugs were prepared or injected. In its unpublished decision affirming this ruling, the Fourth Circuit stated: "South Carolina precedent is squarely on point concerning the interpretation of such an occurrence policy, and establishes that [the] policy covers all damage that occurred during the policy period even if the compounding and the injections leading to the damage occurred before the policy took effect." *Urgent Care*, 232 Fed. Appx. at 226 (describing the relevant policy language as "virtually identical" to the language interpreted in *Joe Harden*). Quoting *Joe Harden,* the court noted that "an occurrence policy 'clearly focuses on the time the *damage* occurs and not on the time of the underlying event that eventually causes the damage[.]'" *Id.* (emphasis in original).

the . . . language of that particular policy and not analyzing a standard occurrence policy." *Joe Harden*, 486 S.E.2d at 90.[17]  As each of these references reveals, the court's focus was on the language of the policy and the intent of the parties as expressed in that language.

This loyalty to and emphasis on the policy language is the hallmark of South Carolina's insurance law cases.  For example, in *SCIC* the court stated that "courts faced with the distasteful chore of apportioning liabilities among multiple insurers should look to the language of the policies to ascertain whether the policies are intended to provide *primary* or *secondary* coverage." *SCIC*, 489 S.E.2d at 203.  Similarly, in *Owners Insurance Company v. Salmonsen*, 622 S.E.2d 525 (S.C. 2005),  the court answered a certified question narrowly limiting its ruling "by focusing on the specific context and policy language" before the court. *Id.* at 526 (addressing whether a particular set of injuries resulted from one or several "occurrences").  As the Fourth Circuit explained in *Spartan Petroleum*, "*Joe Harden* emphasized not policy [arguments] but rather the language of the CGL, particularly the requirement that property damage occur during the policy period."  162 F.3d at 810.

The court, therefore, begins with the language of the MedPro policies which differ in critical respects from the policy at issue in *Joe Harden*.  The most critical distinction is the inclusion of

---

[17]  The policy at issue in *Spinx Oil* provided coverage for environmental damage for "pollution incident(s) that *commenced* on or after the effective date of the policy." *Joe Harden*, 486 S.E.2d at 90 (emphasis in original).  "Because of the difficulty of determining when the pollution incident actually commenced, [the court] interpreted 'commenced' to mean when damage was first discovered." *Id.*  Later decisions in both the federal and state court have suggested that *Spinx Oil* was overruled by *Joe Harden*.  *See Spartan Petroleum Co., Inc. v. Federated Mut. Ins. Co.*, 162 F.3d 805 (4th Cir. 1998) (suggesting *Joe Harden* "effectively overruled" *Spinx Oil*); *Brenco v. South Carolina Dept. of Transportation*, 659 S.E.2d 167, 169 (S.C. 2008) (citing *Spinx Oil* in support of a proposition not at issue in *Joe Harden* but noting it was "overruled on other grounds" by *Joe Harden*).  Whether or not *Spinx Oil* has been overruled, the significance of the *Joe Harden* reference to it is that the state court looks first and foremost to the policy language.

retroactivity provisions in MedPro's policies, both in defining the scope of and limitations on coverage. These provisions focus not on the date of injury (a critical factor considered in *Joe Harden*) but on the date the professional services were or should have been rendered. The first such limitation is found in the basic coverage provisions which apply only to claims for damages "BASED ON PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED AFTER THE RETROACTIVE DATE, BY THE INSURED[.]" Stipulation, Ex. G. (Dkt. No. 36-8 at 3). Similarly, under the heading "EXCEPT THIS POLICY DOES NOT COVER[,]" the policies exclude coverage for "any liability for a claim made against the Insured, based upon professional services rendered or which should have been rendered prior to the Retroactive Date Shown on this policy[.]" *E.g.,* Stipulation, Ex. G (Dkt. No. 36-8 at 3).

Both of these provisions focus on the date of the act giving rise to the claim for damages, rather than the date the damages occurred (as in the occurrence policy at issue in *Joe Harden*). The plain language of either provision is, therefore, independently sufficient to preclude coverage for injuries resulting from actions (or inactions) predating the policies' retroactive date of October 1, 2003. *See generally Golden Hills*, 561 S.E.2d at 358-59 (giving effect to exclusion even where the rule in *Joe Harden* otherwise brought the claim within the scope of the policy). A number of courts faced with similar issues have concluded that claims-made policies with retroactive dates do not cover injuries flowing from negligent acts or omissions predating the policy retroactive date. *See Marshall v. Kansas Medical Mut. Ins. Co.*, 73 P.3d 120 (Kan. 2003) (finding retroactivity limit in claims-made policy unambiguous and holding that limit excluded coverage for doctor's alleged malpractice in delivery of child where the delivery occurred prior to the retroactive date); *Travelers Indem. Co. v. Mut. Ins. Co. of Ariz.*, 731 P.2d 632 (Ariz. App. Div. 2 1986) (finding no coverage under modified claims-made policy where act of malpractice occurred before the specified

retroactive date and there was no continuing treatment thereafter and, instead, imposing all liability for subsequent damages on the occurrence-based policy in effect at the time of the malpractice).

The discussion of what constitutes "one incident" in Section E of MedPro's policies does not suggest any different result. Indeed, it is of no relevance to the present case. This is because Section E addresses when MedPro's aggregate limits, as opposed to its single-incident limits, come into play. In short, this section relates only to the maximum amount which will be paid for a covered claim or claims. It does not define whether the claim is covered in the first instance.

In light of the above analysis of MedPro's policy language, the court concludes that MedPro's coverage is limited to injuries resulting from treatment provided, or which should have been provided, after October 1, 2003. In light of Dr. Voss's uncontradicted testimony, this would not exceed twenty percent of the total damages. Thus, even if MedPro were the only insurance provider, it would be responsible for no more than twenty percent of Shealy's damages.

The court does not, however, agree with MedPro's argument that it has no liability. This argument is based on the dual facts that: (1) Shealy's injuries resulted from a single course of treatment which began before October 1, 2003, and (2) that course of treatment remained essentially unchanged until Dr. Hibbits referred Shealy to Dr. Voss who took immediate action ending any further deterioration in Shealy's condition. *See* Dkt. No. 35 at 12-13.

In making this argument MedPro relies, *inter alia*, on *Aetna Cas. & Sur. Co. v. Med. Protective Co.*, 575 F. Supp. 901 (N.D. Ill. 1983). This court finds *Aetna* inapposite as the issue in *Aetna* was whether injuries at issue should be treated as a single incident or occurrence subject to the single-claim limit or as multiple claims allowing coverage under the aggregate limits of the policy. Thus, *Aetna* does not aid the court in determining whether a course of treatment which begins before but continues after a retroactive date in a claims-made policy is excluded from

16

coverage.  *See also Wilson v. Ramirez, M.D.*, 2 P.3d 778 (Kan. 2000) (finding, for purpose of determining whether single-claim or aggregate coverage applied, that physician's failure to diagnose condition was a single occurrence where doctor made only one diagnosis and continued to rely on that diagnosis).

Further, the facts in the present case suggest repeated office visits subsequent to MedPro's retroactive date during which Dr. Hibbitts continued to evaluate and treat Shealy's problems, albeit ineffectively.  This is distinguishable from the situation in *Aetna*, where the error was largely the doctor's failure to monitor the patient's use of a long-standing prescription.  *Aetna* at 902 (noting dispute was presented on stipulated facts including that "there was little if any discussion of [the patient's] usage of the drug [after the initial prescription], only a series of refilled prescriptions.").

MedPro's policy language does not, in any event, favor relieving MedPro of all responsibility.  The very language which relieves MedPro of responsibility for injuries resulting from actions and omissions predating October 1, 2003 (the MedPro policies' retroactive date) suggests an intent to cover claims for acts *and omissions* which occur after that date, even if merely a continuation of a course of treatment commenced before that date.  As noted above, MedPro's policies provide coverage equally for claims based on *failure to provide treatment* as they do for claims for improper treatment.  Giving effect to this policy language requires MedPro to cover Shealy's claims to the extent they are based on Dr. Hibbitts' failure, during office visits or other consultations after the retroactive date, to undertake a substantially different course of treatment (removal of the artificial hip rather than continued wound care).

**2.     ALLOCATION OF RESPONSIBILITY.**

For reasons set forth above, the court concludes that JUA is, as a matter of law, solely

responsible for that portion of the settlement attributable to injuries Shealy suffered prior to October 1, 2003. This is because MedPro's coverage does not apply to injuries resulting from professional negligence (whether by action or ommission) which occurred before that date. Thus, there is no need to "allocate" responsibility for this portion of damages, although there is a need to determine what that amount should be.

The only evidence presented as to the degree of such damages is Dr. Voss's testimony that 80 to 85% of the damage was done before October 1, 2003. MedPro relies on the lower figure, giving JUA the benefit of any uncertainty in Dr. Voss's testimony. Applying this lower figure, the court concludes that JUA is, as matter of law, solely responsible for the first 80% of the amount of the settlement: $380,000.[18]

JUA and MedPro are jointly responsible for the remaining 20% of the settlement: $95,000.[19] The question becomes how to allocate this percentage and resulting portion of the settlement ($95,000) between MedPro and JUA. Both policies state (and *SCIC* suggests) that the allocation should be proportionate to total coverage.[20] JUA provided coverage under a total of four policies

---

[18] This amount is calculated as follows: $475,000 x .80 = $380,000.

[19] Because the parties have suggested no other basis on which to determine the percentage of injury attributable to Dr. Shealy's actions and inactions during this period, the court accepts the figure to be as MedPro represents: 20%. As noted above, the use of this figure gives JUA the benefit of any uncertainty in Dr. Voss's testimony which was that 80 to 85% of the injury occurred before this date.

[20] There are, of course, other methods of allocation. *See Atchison, Topeka & Sante Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097 (Kan. 2003) (suggesting allocation should be based on when damages occurred during extended period covered by multiple insurers and, if not, based on time-on-risk); *See Stonehenge Engr. Corp. v. Employers Ins. of Wausau*, 201 F.3d 296, 305 (4th Cir. 2000) (suggesting allocation of responsibility between multiple insurers over an extended period of time for progressive personal injury damages should be based on the period of time covered by the insurers' policies). Here, however, the method of allocation is dictated by the JUA and MedPro policies which require allocation in proportion to the total available coverage.

which would have extended coverage to this period in light of *Joe Harden*. Collectively, these policies (issued to Hibbitts and PBJ for $200,000 each covering two different periods of time) totaled $800,000 in coverage. MedPro provided coverage under two policies which were in force at the time the claim was filed. Collectively, these MedPro policies provided total (per incident) coverage of $2,000,000. Thus, JUA is responsible for 28.57% of the portion of the settlement attributable to this period (800,000/2,800,000) and MedPro is responsible for the remaining 71.43% (2,000,000/2,800,000). Applied to the $95,000 attributable to this period, this results in allocation of an additional $27,141.50 to JUA ($95,000 x .2857) and allocation of a total of $67,858.50 to MedPro ($95,000 x .7143).

MedPro contributed $200,000 to the settlement. For reasons discussed above, this amounts to payment of $132,141.50 more than was properly allocated to MedPro. MedPro is, therefore, entitled to reimbursement of this amount from JUA.

## CONCLUSION

For the reasons set forth above, the court grants in part and denies in part the cross-motions for summary judgment in these actions, declaring the parties' respective responsibility for the $475,000 settlement of Shealy's claims to be as follows: MedPro is responsible for $67,858.50 and JUA is responsible for $407,141.50 of the total settlement.

IT IS SO ORDERED.

S/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
August 17, 2009